**WAGNER ELECTRIC CORPORATION, McGraw-Edison Company, and Edison International, Inc., Plaintiffs,**

**v.**

**Lee THOMAS, as Administrator of the United States Environmental Protection Agency; Morris Kay, as Regional Administrator of Region VII of the United States Environmental Protection Agency; the United States Environmental Protection Agency; and the Land Clearance for Redevelopment Authority of the County of St. Louis, Missouri, Defendants.**

**Civ. A. No. 85-2212-O.**

United States District Court, D. Kansas.

June 20, 1985.

Byron L. Gregory, Louis M. Rundio, Jr., Steven H. Hoeft, Stephen P. Krchma, McDermott, Will & Emery, Chicago, Ill., Charles A. Getto, J. Nick Badgerow, McAnany, Van Cleave & Phillips, Kansas City, Kan., for plaintiffs.

David Lamar Kopp, Asst. Regional Counsel, U.S. E.P.A., Kansas City, Kan., Michael W. Neville, Dept. of Justice, Washington, D.C., Benjamin L. Burgess, U.S. Atty., Julie Robinson Trice, Asst. U.S. Atty., Kansas City, Kan., for defendants Lee Thomas, Morris Kay, and U.S. E.P.A.

William V. North, Shughart, Thomason & Kilroy, Overland Park, Kan., Albert A. Michenfelder, Jr., Steven W. Koslovsky, Ziercher, Hocker, Human, Michenfelder & Jones, Clayton, Mo., for defendant The Land Clearance for Redevelopment Authority of the County of St. Louis, Mo.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

Plaintiffs in this action have filed a motion to stay the enforcement of an order

issued by defendant Morris Kay in his capacity as Regional Administrator of the Environmental Protection Agency (EPA). A hearing on the motion was held on April 9, 1985, and both sides have presented numerous written briefs. We are now prepared to rule.

## I. *Statutory Framework.*

The challenged EPA order was issued pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* Perhaps the best known feature of CERCLA is the "Superfund" established to permit immediate governmental cleanup of hazardous waste sites. *See* CERCLA § 221, 42 U.S.C. § 9631. At issue in this case, however, are certain other provisions of that Act which permit EPA to replenish the Superfund by bringing a civil action against the party or parties actually responsible for the hazardous wastes.

When the President (and, through delegation of authority, the EPA Administrator) determines that "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance" from a particular site, he may pursue one of three options. First, he may file a civil suit to obtain a court order enjoining the responsible party or parties to take such action as may be necessary to remove the hazardous waste threat. CERCLA § 106(a), 42 U.S.C. § 9606(a). Second, he may issue an *administrative* order directing the responsible party or parties to take the appropriate actions. *Id.* And, third, once he determines that a party will not comply with a judicial or administrative order issued under CERCLA § 106(a), he may expend Superfund monies to pay a third party for remedying the situation. CERCLA § 104(a)(1), 42 U.S.C. § 9604(a)(1). Where this third option is employed, the responsible party or parties are liable to the Superfund for any money drawn therefrom as a part of a cleanup response. CERCLA

§ 112(c)(1), 42 U.S.C. § 9612(c)(1). Under any of these three options, the "responsible party or parties" are those specifically defined in CERCLA § 107(a), 42 U.S.C. § 9607(a).

In enacting this statutory framework, Congress provided that each option would carry its own incentive for compliance by a responding party. Refusal to comply with a judicial cleanup order, of course, would carry a contempt sanction. One who "willfully violates, or fails or refuses to comply with, any order" issued by EPA under CERCLA § 106(a) may be forced to pay a civil penalty of up to $5,000.00 a day. CERCLA § 106(b), 42 U.S.C. § 9606(b). And, where a responsible party "fails without sufficient cause" to comply with an EPA cleanup order, thus forcing EPA to expend Superfund monies to accomplish that cleanup, the noncomplying party may be forced to pay "punitive damages" of up to three times the amount expended from the Superfund (in addition to the actual expenditures recoverable under CERCLA § 112(c)(1)). CERCLA § 107(c)(3), 42 U.S.C. § 9607(c)(3).

It is undisputed that CERCLA requires no administrative hearing before EPA issues a cleanup order under § 106(a) or elects to expend Superfund monies under § 104(a)(1). Accordingly, a responding party's liability for daily penalties and/or punitive damages may *accrue* prior to any administrative or judicial hearing. *See Aminoil, Inc. v. United States Environmental Protection Agency,* 599 F.Supp. 69, 73 (C.D.Cal.1984). The *assessment* of such penalties or damages, however, may come only after EPA prevails in an enforcement or recovery action filed in the United States District Court. Should a responding party convince the court that it is not a "responsible party," it escapes liability for such sums.

A party choosing not to contest an EPA cleanup order may simply comply therewith. Since EPA would then be barred from seeking either daily penalties or punitive damages, the complying party could thus limit its loss exposure to the actual

cost of cleanup. Such a complying party also retains the option of later establishing in court that it was not "responsible" for the hazardous wastes. Having made such a showing, however, that party is *not* entitled to seek reimbursement from EPA for amounts expended in the cleanup effort. *Aminoil*, 599 F.Supp. at 73–74. That party's sole remedy is to identify the true responsible party or parties, and to seek reimbursement from them. *See* CERCLA § 112(c)(2), 42 U.S.C. § 9612(c)(2).

## II. *Administrative Action in this Case.*

In this case, the EPA Administrator chose not to seek a judicial injunction requiring these plaintiffs to initiate cleanup activities. Rather, he opted to issue an administrative order directing them to do so. Thus, on March 19, 1985, EPA filed with its Regional Hearing Clerk a notification that the Regional Administrator might issue an administrative order under CERCLA § 106(a). A copy of this notice was received by the plaintiffs on the next day. The notice included the EPA's proposed findings of fact, conclusions of law, determination, and order. Plaintiffs were given until 5:00 p.m. on March 22nd to submit a written response to EPA's regional office in Kansas City, Kansas. The notice quite plainly stated that:

> Circumstantial exigencies having been considered, Region VII will not extent (sic) this deadline. Only evidence timely submitted will be considered. Nethier (sic) oral argument nor oral testimony will be recieved (sic).
>
> ... This administrative proceeding constitutes the named potential respondents only pre-enforcement opportunity to show that sufficient cause exists for non-compliance with the proposed order.
>
> ... Any order that may issue as a result of the pending determination will be unilateral. Therefore, no dialogue over the substantive provisions contained in the attached proposed order will be exchanged.

Notice of March 19, 1985, at 2–3.

On March 22, 1985, plaintiffs submitted a six-page response to this proposed order.

They objected to the procedures used in issuing the proposed order and requested: (1) that the deadline for presenting evidence be extended to April 30, 1985, (2) that they be granted a hearing at which they could cross-examine any witnesses EPA might use to support the "evidence" in the notice, and (3) that a record of that hearing be preserved for purposes of judicial review. On the day before, such requests had already been presented in person to an official at EPA's regional office. All such requests had been denied at that time.

The final administrative order was issued on March 27, 1985, and differs in only minor respects from the proposal of eight days earlier. Among the order's findings of fact are the following:

(1) Plaintiffs (inter-related corporations) owned an allegedly contaminated site in St. Louis County, Missouri, until 1983.

(2) During 1967 and 1968, a facility located at that site produced utility transformers containing polychlorinated biphenyls (PCBs).

(3) PCBs have been designated as a hazardous substance in accordance with various federal environmental laws, and were confirmed to be present in certain portions of the site.

(4) Pursuant to a written agreement executed on October 27, 1982, and performed by July 1, 1983, the entire site was transferred on a donative basis from plaintiffs to the Land Clearance Redevelopment Authority, County of St. Louis, Missouri ("LCRA").

Among the order's conclusions of law are that plaintiffs and LCRA are all "responsible parties" within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a), and that "[t]here may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substance from the facility within the meaning of" CERCLA § 106(a), 42 U.S.C. § 9606(a). Plaintiffs have been ordered to

conduct all surveys and other studies necessary for the development of a cleanup plan. Said plan is to be submitted to the EPA for its approval and then implemented by the plaintiffs. Apparently accepting LCRA's assertion that it lacks the financial resources to participate in a cleanup operation, *see* Transcript of April 9, 1985, Hearing, at 29, the order limits LCRA's responsibility to providing plaintiffs and other necessary parties with access to the site.

The order notes that it is "effective upon receipt" by these plaintiffs and LCRA, and that "[a]ll times for performance of response activities shall be calculated from that time and date." Order of March 27, 1985, at 13. The order also contains a separate section captioned "Penalties for Non-Compliance." This section makes reference to the daily penalties provision of CERCLA § 106(b) and the punitive damages provision of CERCLA § 107(c)(3). Given the order's immediate effective date, we assume that the $5,000.00 daily penalty began to accrue on or about March 28, 1985.

In its brief of May 17, 1985, however, EPA notified both the court and the plaintiffs that daily penalties are no longer an issue in this case. EPA explained that it no longer intends to seek a court order enforcing its administrative order. Rather, it will exercise its authority under CERCLA § 104(a)(1) to expend Superfund monies in accomplishing the cleanup effort. The brief further expressed EPA's intent to seek recovery from the plaintiffs for the full cost of the government's cleanup effort, and it did not rule out a request that plaintiffs be forced to pay the treble punitive damages assessable under CERCLA § 107(c)(3). Despite EPA's decision to expend Superfund monies on this cleanup effort, the brief noted that plaintiffs will still be allowed to request to do whatever work has not already been contracted. By doing so, of course, they would reduce, to that extent, their exposure to an assessment of punitive damages. *See* EPA Brief of May 17, 1985, at 2–3.

III. *Availability of Judicial Review.*

In their motion to stay the EPA order, plaintiffs raise the following distinct claims:

(1) the plaintiffs had no opportunity to participate in a meaningful way in the decision-making process;

(2) the Order does not afford the plaintiffs adequate notice of the actions they are required to take; and

(3) the penalties of the Order chill the plaintiffs' exercise of their right to challenge the Order.

Plaintiffs' Brief of April 8, 1985, at 8.

Before we may grant plaintiffs relief as to any of these three claims, that claim must clear at least three major hurdles. First, we must determine that we have subject matter jurisdiction to consider the claim. Second, assuming such jurisdiction, we must determine if the claim is ripe for judicial review. And third, any claim which is both within our subject matter jurisdiction and ripe for judicial review must still be measured against the standards for obtaining a stay of an administrative order.

A. *Subject Matter Jurisdiction.*

■ Because CERCLA was enacted only in 1980, and has been implemented even more recently, neither the Supreme Court nor any circuit court of appeals has had occasion to address these issues. However, the reported district court decisions are virtually unanimous in holding that a federal court lacks subject matter jurisdiction to review the merits of a CERCLA order prior to EPA's seeking to enforce that order. *See, e.g., Aminoil, supra,* 599 F.Supp. at 71; *Lone Pine Steering Committee v. United States Environmental Protection Agency,* 600 F.Supp. 1487, 1494 (D.N.J.1985); *Earthline Co. v. Kin-Buc, Inc.,* 21 Env't Rep.Cas. (BNA) 2161 (D.N.J. July 23, 1984); *United States v. Outboard Marine Corp.,* 104 F.R.D. 405 (N.D.Ill.1984). *Cf. J.V. Peters & Co., Inc. v. Ruckelshaus,* 584 F.Supp. 1005, 1010 (N.D.Ohio 1984) (no pre-enforcement judicial review unless EPA action had "absolutely no rational basis"). Plaintiffs' first

two claims relate to the merits of the EPA order. Therefore, we lack subject matter jurisdiction to consider those claims. The third claim, however, relates not to the merits of the order, but to the constitutionality of the statutory scheme under which it was issued. Thus, CERCLA § 113(b), 42 U.S.C. § 9613(b), provides us with jurisdiction to consider this third claim. *Aminoil*, 599 F.Supp. at 72.

### B. *Ripeness.*

■ In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Court addressed the question of when a controversy is "ripe" for judicial resolution. As the Court noted:

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

387 U.S. at 149, 87 S.Ct. at 1515. The issue presented by plaintiffs' third claim is a "purely legal one," and is thus fit for judicial determination. *Id.; Aminoil*, 599 F.Supp. at 72. Moreover, plaintiffs are placed in the unenviable position of deciding whether to disobey the EPA order, and thus run the risk of incurring treble punitive damages, or to comply with the order, and, if subsequently proven *not* to be "responsible parties," have a right to seek reimbursement only from the apparently insolvent LCRA. As the *Aminoil* court aptly noted:

> If this Court were to withhold its consideration of the issue, plaintiffs will suffer the hardship of having to make a decision that may foreclose their access to a legal forum without the aid of a judicial determination clarifying the constitutionality of the parameters within which such a decision must be made.

599 F.Supp. at 72. Thus, the hardship to the plaintiffs of withholding court consideration of their claim also argues in favor of a conclusion that this issue is ripe for judicial resolution. Accordingly, we may proceed to measure plaintiffs' third claim

against the standards for obtaining a stay of an administrative order.

### IV. *Entitlement to a Stay of this Administrative Order.*

■ Where parties have sought to stay administrative action, the Tenth Circuit has simply applied its preliminary injunction standard. *See National Indian Youth Council v. Andrus*, 623 F.2d 694, 695 (10th Cir.1980); *Associated Securities Corp. v. Securities & Exchange Commission*, 283 F.2d 773, 774–75 (10th Cir.1960). As stated in *Otero Savings & Loan Ass'n v. Federal Reserve Bank of Kansas City, Mo.*, 665 F.2d 275 (10th Cir.1981), a party seeking to obtain a preliminary injunction must establish:

(1) substantial likelihood that the movant will eventually prevail on the merits;

(2) a showing that the movant will suffer irreparable injury unless the injunction issues;

(3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing parties; and

(4) a showing that the injunction, if issued, would not be adverse to the public interest.

665 F.2d at 278. Moreover:

> The Tenth Circuit has adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). Because the application of this more liberal "probability of success" standard depends upon the establishment of the other three elements, we will first address those other elements.

## A. *Irreparable Injury.*

If plaintiffs choose not to comply with this EPA order, they may eventually be forced to pay four times the amount expended from the Superfund in effecting a cleanup of the allegedly contaminated site. If they do comply, and later establish that they were not "responsible parties" within the meaning of CERCLA, plaintiffs cannot seek reimbursement from EPA. It is true that plaintiffs could then seek reimbursement from the true responsible party or parties. In this case, however, the only other allegedly responsible party identified by EPA is the LCRA, which EPA has already found to be financially unable to bear the cost of cleanup. As plaintiffs describe their dilemma, they are thus presented with a "Hobson's choice"—either fail to comply and face massive liability, or comply and all but abandon any hope of recovering funds spent on cleanup activities for which they were not truly responsible. Accordingly, unless plaintiffs can obtain a determination as to whether the EPA order validly names them as responsible parties, they are subject to irreparable injury.

## B. *Damage to the EPA.*

In the context of this case, this element of the preliminary injunction standard is irrelevant. As an administrative agency, EPA exists only to serve the public interest. Thus, its interests are fully subsumed within the broader public interest. Any asserted interest other than that of the public would not be legitimate, and will not be considered by this court.

## C. *The Public Interest.*

"There is a compelling public interest in oversight of governmental actions which deprive individuals of generally protected liberty or property interests." *Industrial Park Development Co. v. United States Environmental Protection Agency,* 604 F.Supp. 1136, 1145 (E.D.Pa. March 21, 1985). To the extent that plaintiffs might establish their entitlement to relief on the merits, then, the public interest would suf-

fer if we were to deny plaintiffs' request for a stay of this order.

Moreover, now that EPA has elected to expend Superfund monies in effecting the desired cleanup, we assume that the process will proceed without delay. Thus, even if we were to stay this aspect of the EPA order, the health and safety of those living near the allegedly contaminated site would be protected. Taken together, these factors lead to the conclusion that such a stay would not be adverse to the public interest.

## D. *Probability of Success on the Merits.*

Having established that they could suffer irreparable injury if the stay were not granted, and that the stay would not be adverse to the public (and thus EPA's) interest, plaintiffs need only establish that they have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Savings & Loan Ass'n, supra,* 665 F.2d at 278. In connection with this claim for relief, the parties have briefed three interrelated issues. Each will be considered in turn.

### 1. *Chilled Access to Judicial Review.*

"Access to the courts of the United States is a constitutional right guaranteed by the Due Process Clauses of the Fifth and Fourteenth Amendments. This right of access to the courts cannot be infringed upon or burdened." *Silver v. Cormier,* 529 F.2d 161, 163 (10th Cir.1976) (citations omitted). The statutory provisions at issue in this case do not *directly* deny plaintiffs access to federal court. Indeed, plaintiffs can suffer no detriment unless and until EPA files an action against them in federal court. *See* CERCLA § 107(c)(3), 42 U.S.C. § 9607(c)(3). It is clear, however, that the protection of the due process clause extends to more than those whose access to federal court is directly foreclosed.

In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court

considered a state statute enabling an administrative commission to establish a schedule of railroad freight rates. The railroads were granted no hearing before this commission, nor was there a provision for judicial review as to the reasonableness of the rates imposed. If the railroads wished to assert that the rates deprived them of their property without just compensation, their only recourse was to suffer a criminal indictment and to contest the adequacy of the rates in the ensuing criminal prosecution. The Court found that statutory framework to be a violation of the railroads' right to procedural due process. Its reasoning was as follows:

> It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights.

*Young*, 209 U.S. at 147, 28 S.Ct. at 448.

As was true of the rates in *Young*, this EPA order may not be challenged until such time as it is sought to be enforced. By subjecting the plaintiffs to possible punitive damages for asserting an unsuccessful challenge to the order, the statute may be said to intimidate them into complying with the order and abandoning their right to seek a judicial determination of its validity. Therefore, plaintiffs correctly argue that they fall within the protective embrace of the rule enunciated in *Ex Parte Young*.

### 2. *"Good Faith" Requirement.*

Only twelve years after its holding in *Young*, however, the Court qualified its holding. The statute at issue in *Oklahoma Operating Co. v. Love*, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920), established an administrative commission with authority to regulate businesses it deemed to have monopoly power. After notice and a hearing, the commission could order a business to adhere to certain rates. Should those rates not be obeyed, the commission could

impose a penalty of up to $500.00 a day. Only in a subsequent contempt proceeding could the validity of the commission's order be challenged. As the Court noted:

> The penalties, which may possibly be imposed, if he pursues this course without success, are such as might well deter even the boldest and most confident.... Obviously a judicial review beset by such deterrents does not satisfy the constitutional requirements, even if otherwise adequate, and therefore the provisions of the Acts relating to the enforcement of the rates by penalties are unconstitutional without regard to the question of the insufficiency of those rates. *Ex Parte Young*, 209 U.S. 123, 147, 28 S.Ct. 443, 448.

*Love*, 252 U.S. at 336–37, 40 S.Ct. at 340.

What is more important for our purposes is the remedy imposed by the *Love* Court:

> The suit should, therefore, proceed for the purpose of determining whether the maximum rates fixed by the Commission are, under present conditions, confiscatory. If they are found to be so, a permanent injunction should issue to restrain their enforcement either by means of penalties or otherwise, .... If upon final hearing the maximum rates fixed should be found not to be confiscatory, a permanent injunction should, nevertheless, issue to restrain enforcement of penalties accrued *pendente lite, provided that it also be found that the plaintiff had reasonable ground to contest them as being confiscatory.*

*Love*, 252 U.S. at 337–38, 40 S.Ct. at 340 (emphasis added). By adding the highlighted phrase, the Court indicated that even though a penalty might discourage a party from seeking judicial review, that penalty could be enforced against a party having no "reasonable ground to contest" the disputed administrative action. In other words, one must assert an objectively good faith challenge to such administrative action before one may invoke the protections of *Ex Parte Young*.

This construction of *Love* is confirmed by the Court's resolution of a similar chal-

lenge in *Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). There a litigant challenged a procedure by which noncompliance with an Internal Revenue Service summons could be punished as contempt of court. The Court rejected a challenge expressly based on *Young* and *Love* by stating:

> This statute on its face does not apply where the witness appears and interposes good faith challenges to the summons. It only prescribes punishment where the witness "neglects" either to appear or to produce. We need not pass upon the coverage of this provision in light of the facts here. *It is sufficient to say that noncompliance is not subject to prosecution thereunder when the summons is attacked in good faith.*

375 U.S. at 447, 84 S.Ct. at 512 (emphasis added). Again, then, the Court held that the provision of a "good faith" defense to a statute penalizing noncompliance with an administrative order sufficiently cured any potential due process violation.

EPA argues that the statutory framework of CERCLA falls within this "good faith" exception to *Ex Parte Young.* We must thus determine if CERCLA § 107(c)(3) does provide for such a good faith defense to the imposition of treble punitive damages. In so doing, we start from the proposition that "in determining the scope of a statute, one is to look first at its language." *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1103, 75 L.Ed.2d 77 (1983). The language of CERCLA § 107(c)(3) is as follows:

> (c) If any person who is liable for a release or threat of release of a hazardous substance fails *without sufficient cause* to properly provide removal or remedial action upon order of the President pursuant to section 104 or 106 of this Act, such person *may* be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action. The President is authorized to commence a civil action against any such person to recover the punitive damages, which shall be in addition to any cost recovered from such person pursuant to section 112(c) of this Act. Any monies received by the United States pursuant to this subsection shall be deposited in the Fund.

(Emphases added.)

As the highlighted portions of this provision indicate, punitive damages "may" be assessed against a party who fails "without sufficient cause" to comply with an EPA order. Use of the term "may" clearly denotes that the reviewing court has discretion *not* to assess punitive damages against a party failing to comply with an EPA order. EPA cites various cases for the proposition that such judicial discretion alone is sufficient to distinguish this provision from the mandatory penalties at issue in *Young. See, e.g., Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1121 & n. 8 (2d Cir.1975), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 8 (1976); *Union Electric Co. v. United States Environmental Protection Agency,* 593 F.2d 299, 306 (8th Cir.1979), *cert. denied,* 444 U.S. 839, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979). We are not so inclined as those courts to believe that mere judicial discretion sufficiently removes the chill otherwise placed on plaintiffs' access to judicial review. Absent any guidelines by which a court is to exercise its discretion, plaintiffs are in no position to judge the advisability of a challenge to the order's validity.

Fortunately, we need not address this question. The statute at issue here does provide such guidance for the exercise of the reviewing court's discretion. It states that punitive damages may be imposed only when a party's noncompliance is "without sufficient cause." Since this phrase is inherently ambiguous, and is apparently not defined within the Act, we must look to the Act's legislative history for its proper interpretation.

The court in *United States v. Reilly Tar & Chemical Corp.,* 606 F.Supp. 412 (D.Minn.1985), conducted such a search of

the legislative history and determined that the only specific reference to the "without sufficient cause" language is as follows:

MR. SIMPSON: Under section 107(c)(3), punitive damages may be imposed only when the failure to take proper removal or remedial action upon order is "without sufficient cause." What is intended by the phrase "without sufficient cause"?

MR. STAFFORD: We intend that the phrase "sufficient cause" would encompass defenses such as the defense that the person who was the subject of the President's order was not the party responsible under the act for the release of the hazardous substance. *It would certainly be unfair to assess punitive damages against a party who for good reason believed himself not to be the responsible party.*

*Reilly Tar* 606 F.Supp. at 419–20 (citing 1 *A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980* at 770–71) (emphasis added). *See also Aminoil, supra,* 599 F.Supp. at 73 (citing 126 *Cong. Rec.* at 30986 (November 24, 1980)).

The similarity of the highlighted sentence to the proviso added to the Court's opinion in *Love* is obvious. Both speak of a party who reasonably believes that he has a successful defense to an administrative order. By including the phrase "without sufficient cause," then, Congress apparently intended to bring this statute within the scope of the "good faith" exception to *Young,* as enunciated in both *Love* and *Reisman.*

Even without this useful legislative history, however, we would construe this phrase as referring to a "good faith" defense. Were we not to do so, the statute might well be constitutionally invalid as placing an undue burden on plaintiffs' access to judicial review. We would thus invoke the Supreme Court's repeated admonition that:

If a construction of the statute is fairly possible by which a serious doubt of constitutionality may be avoided, a court

should adopt that construction. In particular, this Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary.

*Califano v. Yamasaki,* 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979) (Court's citation, brackets, and internal quotations omitted). *See also Reilly Tar,* 606 F.Supp. at 419 n. 3 (applying this rule to equate "sufficient cause" with "good faith").

■ Accordingly, we construe CERCLA § 107(c)(3) to prohibit a reviewing court from assessing punitive damages against a party who fails to comply with an EPA order in the reasonable belief that it has a valid defense to that order. As so construed, the statute would pass constitutional muster under either *Young* or the clarification of *Young* contained in *Love* and *Reisman.*

### 3. *Denial of an Administrative Hearing.*

■ Plaintiffs acknowledge that certain of the cases cited by EPA do suggest that the nonmandatory assessment of penalties against one launching an unsuccessful judicial challenge to an administrative order does not violate the due process clause. They seek to distinguish those cases from the case at hand, however, on the ground that each of those cases construed statutes granting the complaining party a hearing at the administrative level. By contrast, CERCLA grants no administrative hearing to parties named in EPA orders; nor did EPA exercise its discretion to grant plaintiffs' request for a hearing. In plaintiffs' view, this denial of an administrative hearing renders even a nonmandatory penalty such as this unconstitutional as a denial of due process.

It is true that nearly all of the cases cited by EPA did construe statutes granting administrative hearings. *See Love, supra,* 252 U.S. at 335, 40 S.Ct. at 339 (no administrative order "except upon due notice and a hearing"); *Reisman, supra,* 375 U.S. at 445, 84 S.Ct. at 511 (party afforded an

opportunity to challenge administrative summons before IRS hearing officer); *Bethlehem Steel Corp. v. United States Environmental Protection Agency,* 669 F.2d 903, 906 (3d Cir.1982) (party entitled to a hearing on the record and a decision within ninety days of receiving notice of alleged violation); *Duquesne Light Co. v. United States Environmental Protection Agency,* 698 F.2d 456, 464 (D.C.Cir.1983) (same statute as in *Bethlehem Steel*); *Union Electric Co. v. United States Environmental Protection Agency,* 593 F.2d 299, 303 n. 4, 304 n. 7 (8th Cir.1979) (party entitled to an "informal administrative conference," at which it may "present information upon the findings of violation"); *Lloyd A. Fry Roofing Co. v. United States Environmental Protection Agency,* 554 F.2d 885, 887, 888 n. 1 (8th Cir.1977) (same statute as in *Union Electric,* although party was granted a "formal evidentiary hearing"). It is also true that *Ex Parte Young* contains the following suggestive passage:

> In the case, however, of the establishment of certain rates *without any hearing,* the validity of such rates necessarily depends upon whether they are high enough to permit at least some return upon the investment (how much it is not now necessary to state), and an inquiry as to that fact is a proper subject of judicial investigation. If it turns out that the rates are too low for that purpose, then they are illegal. Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (*no prior hearing having ever been given*) only upon the condition that if unsuccessful he must suffer imprisonment and pay fines as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid.

209 U.S. at 147–48, 28 S.Ct. at 448–449 (emphases added). While we understand the distinction plaintiffs are attempting to draw, we discern at least three problems with such a distinction.

First, none of the cited decisions actually discusses the effect of granting or denying an administrative hearing. Aside from a brief description of the statute at issue, the highlighted phrases are the *Young* decision's only two references to administrative hearings. In those cases which construed statutes *granting* administrative hearings, references to that fact are even more oblique than in *Young.* The only possible exception would be *Duquesne Light Co.,* where the court arguably implies that the *Young* holding may be avoided only by granting an administrative hearing. Near the end of a long footnote, the court states:

> Unlike the penalties in *Ex Parte Young,* which were triggered by any effort to seek review of the underlying legal requirement, the section 120 noncompliance penalties are simply penalties that accrue during the period in which the alleged violator contests his liability to the penalty. Such penalties are common; for example, penalties for violations of the Occupational Safety and Health Act accrue during the period of judicial review of liability, 29 U.S.C. § 666(d), (*l*) (1976). They are valid, *assuming the source is accorded adequate opportunity to challenge their assessment at the administrative level before payment must begin.*

*Duquesne Light Co.,* 698 F.2d at 470 n. 14 (emphasis added).

Although the highlighted phrase appears to support plaintiffs' argument, it is actually quite ambiguous. For example, it refers to "assessment at the administrative level." No such assessment is permissible under CERCLA; rather, EPA must convince a *court* to assess punitive damages. Moreover, the footnote speaks of adequate opportunity to challenge such an assessment "before payment must begin." Again, CERCLA provides these plaintiffs with such an opportunity; they may oppose EPA's request for judicial assessment of such damages. Therefore, the quoted phrase would not necessarily prohibit the procedure established under CERCLA. Indeed, an examination of the statute at issue in *Duquesne Light Co.* reveals that it did permit the assessment of penalties at the administrative level. The quoted language

was thus addressed to an entirely different question than that presented here.

Admittedly, plaintiffs' failure to cite language in support of its argument would not prevent us from recognizing this distinction. However, we could craft such a distinction only by engaging in massive reinterpretation of the case law. That not a single court has so much as suggested such a reinterpretation counsels strongly against such a course.

The second problem with plaintiffs' asserted distinction is even more telling. The claim under review in this case is that the punitive damages provision unconstitutionally chills plaintiffs' exercise of their right to seek judicial review of an administrative order. For this distinction to be valid, plaintiffs must demonstrate some logical nexus between the denial of an administrative hearing and the creation of a chill on their access to the courts. They have suggested no such nexus, and the two issues would seem to be unrelated.

Oddly enough, EPA sets forth a proposition which *would* establish such a nexus between the denial of an administrative hearing and a chill on plaintiffs' right to seek judicial review. They suggest that, in determining whether plaintiffs had a good faith defense to this order, the reviewing court "would restrict its inquiry to the Order, the administrative record, and any information which Plaintiffs gave to the Agency concerning the appropriateness of the Order." EPA Brief of May 17, 1985, at 8. Were this proposition true, plaintiffs would be greatly handicapped in their attempt to convince the reviewing court that their asserted defense (assuming it was unsuccessful) was raised in objective good faith. Because their request for a hearing (with its accompanying oral argument, presentation of plaintiffs' witnesses, and cross-examination of EPA's witnesses) was denied, the administrative record has been created almost entirely by EPA. It therefore contains virtually no evidence that might exculpate these plaintiffs. Faced solely with this administrative record, a reviewing court would cast a skeptical eye on plaintiffs' claim to have asserted a good faith defense to the validity of the order.

EPA cites no authority for this proposition, however, and we find ourselves in disagreement with it. "A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363. It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). To limit a reviewing court to the administrative record, at least where no administrative hearing is required, would surely not be a "meaningful manner" of affording aggrieved parties an opportunity to be heard. We conclude, therefore, that these plaintiffs are free to present to the reviewing court any evidence of their good faith in challenging the validity of this order. In our opinion, EPA's denial of an administrative hearing should be a relevant factor in the reviewing court's determination of plaintiffs' good faith. Thus, plaintiffs have failed to establish any logical nexus between the denial of an administrative hearing and an unconstitutional chill on their right to seek judicial review of this administrative order.

The third problem with plaintiffs' asserted distinction comes in the form of a Fifth Circuit decision which we find legally indistinguishable from the instant case. In *Dan J. Sheehan Co. v. Occupational Safety and Health Review Commission,* 520 F.2d 1036 (5th Cir.1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976), the court addressed a due process challenge to the Occupational Safety and Health Act. Under that Act, the Secretary of Labor is empowered to assess a civil penalty against an employer found (without a hearing) to have violated workplace safety regulations. Within fifteen days thereafter, the employer may contest the Secretary's order by taking an appeal to the Occupational Safety and Health Review Commission (the "Commission"). 29 U.S.C. § 659(c). For each day in which an employer fails to correct an alleged safety violation, he may be assessed a civil penalty of up to $1,000.00. 29 U.S.C. § 666(d). However, such daily penalties do not accrue during the pendency of a Commission re-

view proceeding "initiated by the employer *in good faith and not solely for delay or avoidance of penalties.*" *Id.* (emphasis added). The Commission is given "authority to assess all civil penalties provided in this section, giving due consideration to," *inter alia*, "the good faith of the employer." 29 U.S.C. § 666(i).

The Fifth Circuit considered "whether the threat of increased penalties after employer-initiated review violates the employer's due process rights under the Fifth Amendment." 520 F.2d at 1040. Despite the fact that the employer had no opportunity for an administrative hearing prior to seeking Commission review, the court upheld the Occupational Safety and Health Act against this due process challenge. In so doing, the court took its guidance from Supreme Court decisions that had "focused on the potential for *vindictiveness* to determine whether a particular procedure violates due process." 520 F.2d at 1040 (emphasis added) (citing *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974)). The court concluded that, although the Commission might be tempted to respond vindictively to one who challenged an order of the Secretary of Labor, the employer would be "insulated" from this chilling effect by the availability of judicial review. 520 F.2d at 1042.

In the case at hand, the insulation against potential vindictiveness is even greater. While the Commission might have some stake in an order issued by the Secretary of Labor, a reviewing court has no stake in an EPA order. Since punitive damages can *only* be assessed by the reviewing court, vindictiveness should play absolutely no role in this process.

Although *Dan J. Sheehan Co.* involved an alleged chill on a party's right to seek *administrative* as opposed to *judicial* review, we do not view this as an important distinction. The protected interest is the same—the right to seek review of an administrative order. Furthermore, under the Occupational Safety and Health Act, review by the Commission is a prerequisite to judicial review. 29 U.S.C. § 660(a). Thus, a chill on administrative review would effectively chill one's right to judi-

cial review as well. We conclude, therefore, that the Fifth Circuit's decision in *Dan J. Sheehan Co.* effectively undermines the distinction pressed upon us by the plaintiffs.

(We would note that this aspect of plaintiffs' argument bears a great similarity to the first of their three claims lodged against the EPA order. That is, they assert that they had no opportunity to participate in a meaningful way in the administrative decision-making process. As noted in part III of this memorandum, we lack subject matter jurisdiction to consider that first claim. In rejecting this distinction, however, we do not mean to imply that plaintiffs' first claim for relief is without merit. Indeed, the United States District Court for the Eastern District of Pennsylvania has suggested that "CERCLA's failure to provide either a pre-deprivation or prompt post-deprivation hearing may represent an unconstitutional deprivation of [a respondent's] due process rights." *Industrial Park Development Co., supra,* 604 F.Supp. 1136, 1141. Such a claim may be raised, however, only if and when EPA seeks to obtain reimbursement from the plaintiffs for monies expended by the Superfund.)

### 4. *Conclusions as to Probability of Success.*

■ We have thus concluded that, despite CERCLA's failure to provide for an administrative hearing, its provision of a "good faith" defense to the assessment of punitive damages sufficiently answers any due process objection grounded in *Ex Parte Young*. We emphasize, however, that our holding is dependent upon two underlying premises: *first*, that a reviewing court would not be limited to the administrative record, and *second*, that this "good faith" defense imposes a real check on the court's discretion in assessing punitive damages. Were the court limited to the administrative record, responding parties would be denied a meaningful hearing on the issue of good faith. And, were the reviewing court given unbridled discretion in assessing this penalty, the resulting uncertainty would itself impose a chill on a party's right to seek judicial review.

Under our construction of CERCLA § 107(c)(3), a party's potential liability for treble punitive damages would impose no unwarranted chill on that party's access to judicial review of an EPA cleanup order. Accordingly, we conclude that plaintiffs have failed to raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *See Otero Savings & Loan Ass'n, supra,* 665 F.2d at 278. Because plaintiffs have failed to establish this fourth element necessary to obtain preliminary injunctive relief, we must deny their motion to stay enforcement of this EPA order.

## V. *Caveat.*

Because both parties to this suit have emphasized the public policy implications of our decision, we feel compelled to address those concerns. We first note that our decision in this matter has been based on our understanding of the law, and not on public policy. That having been said, we should dispel certain possible misconceptions.

For instance, our liberal definition of "good faith" could lead one to conclude that parties will seldom be assessed treble punitive damages under CERCLA § 107(c)(3). Without that threat of punitive damages, respondents to EPA cleanup orders might make it a practice to withhold compliance with those orders until EPA obtained judicial enforcement thereof. Surely this would undermine the intent of Congress in enacting CERCLA.

Future respondents to such EPA orders would be ill-advised, however, to place unreasonable reliance on this aspect of our decision. CERCLA is quite clear as to which parties are "responsible" for the creation, and thus the cleanup, of hazardous waste sites. Once the EPA targets such a party, it can usually remove any good faith defense to a cleanup order merely by granting that party an administrative hearing at which EPA presents persuasive evidence of the party's "responsibility." Where this is done, a reviewing court would be far less likely to accept a party's contention that its challenge to an EPA order was asserted in objective good faith.

Thus, although we now find that CERCLA § 107(c)(3) meets the constitutional standard of procedural due process even without an administrative hearing requirement, EPA may soon find that its enforcement of CERCLA is unworkable without the provision of such hearings. Were EPA to make it a practice to afford *all* respondents an expedited but fair hearing at the administrative level, rational public policy would surely be the victor.

## ORDER

IT IS THEREFORE ORDERED that plaintiffs' motion to stay the enforcement of EPA's March 27, 1985, administrative order is denied.