**WOODLAND PRIVATE STUDY GROUP, Minnesota Mining and Manufacturing Company, and Rohm and Haas Company, Plaintiffs,**

v.

**STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Robert E. Hughey, individually and as Commissioner of Environmental Protection, and Joseph A. Rogalski, individually, and as Assistant Manager, Division of Waste Management, Department of Environmental Protection, Defendants.**

Civ. A. No. 85–2291.

United States District Court,
D. New Jersey.

Aug. 29, 1985.

William H. Hyatt, Jr., Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for plaintiffs.

Genevieve K. LaRobardier, Margolis, Chase, Kosocki, Aboyoun & Hartman, P.A., Verona, N.J., and David R. Berz, Weil, Gotshal & Manges, Washington, D.C., for plaintiff-intervenor Purex Industries, Inc.

Irwin Kimmelman, Atty. Gen. of N.J. by Mary C. Jacobsen, Ross A. Lewin, Deputy Attys. Gen., Trenton, N.J., for defendants.

### OPINION

BROTMAN, District Judge.

## INTRODUCTION

The Minnesota Mining and Manufacturing Company ("3M") and Rohm and Haas Company ("R & H"), who together constitute the "Woodland Private Study Group," bring this action for injunctive and declaratory relief from alleged deprivations of their property without due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* The court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. R & H and 3M name as defendants the New Jersey Department of Environmental Protection ("DEP"), Robert E. Hughey, individually and as Commissioner of the DEP, and Joseph A. Rogalski, individually and as Assistant Director, Division of Waste Management, DEP. The complaint alleges that defendants are coercing plaintiffs into complying with two DEP Directives and Notices of Violations ("Directives") issued on March 4, 1985, under authority vested in the DEP by the Spill Compensation and Control Act, N.J.S.A. 58:10–23.11 *et seq.* ("Spill Act"). The Directives order R & H, 3M and others to contribute to the costs of a proposed state study of environmental damage at two sites in Woodland Township, Burlington County, New Jersey. Plaintiffs allegedly deposited hazardous wastes at these sites during the 1950's and 1960's.

Presently before the court are several dispositive motions, and a request by Purex Industries Inc., ("Purex") to intervene as a party plaintiff. R & H and 3M ask the court to enjoin and declare unconstitutional provisions of the Spill Act which allegedly deny them a meaningful opportunity to challenge the DEP Directives. Defendants seek an order dismissing the complaint for failure to state a claim for which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Alternatively, defendants request summary judgment pursuant to Fed.R. Civ.P. 56.

The parties having presented, and the court having considered, material outside of the pleadings, defendants' motion will be treated as a request for summary judgment. Fed.R.Civ.P. 12(b). For the reasons stated below, the court finds that there exists no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law. Accordingly, the court will grant defendants' motion for summary judgment and deny the petition for injunctive relief.

## FACTUAL BACKGROUND

The New Jersey Spill Act was enacted on January 6, 1977, to protect the economy and the environment of New Jersey from discharges of petroleum and other hazardous substances.[1] This action arises under

---

1. The act was primarily intended to address the problems associated with oil spills on New Jersey's waterways, due to anticipated oil explora-

tion off of the New Jersey coast. The New Jersey legislature wanted to protect the state's recreational water uses, and was unsure what

Section 7(a) of the Spill Act, which provides, in pertinent part,

> Whenever any hazardous substance is discharged, [the DEP] may, in its discretion, act to remove or arrange for the removal of such discharges or may direct the dischargers to remove or arrange for the removal of such discharge.... Any discharger who fails to comply with such a directive shall be liable to [the DEP] in an amount equal to three times the cost of such removal.

N.J.S.A. 58:10–23.11f(a).

During the 1950's and 1960's, the Industrial Trucking Service Corporation ("Industrial Trucking") allegedly deposited wastes generated by 3M, R & H, Hercules, Inc., the Manhattan Soap Company (corporate predecessor to Purex), Standard Oil of Ohio ("SOHIO"), and possibly other various manufacturing concerns, at two dump sites in Woodland Township, Burlington County, New Jersey. Affidavit of Gerard Burke, Deputy Director, Office of Regulatory Services, DEP ("Burke Affidavit"), at ¶¶ 2–3. Both sites are now essentially devoid of vegetation. They are littered with rusted and corroded drums, broken glassware, and black resinous materials. Sampling conducted by the DEP has revealed the presence of volatile organics and pesticides at both sites, and ground water contamination at the site near New Jersey Route 72. Affidavit of Russell Trice, Site Manager, Division of Waste Management, DEP at ¶ 2. The United States Environmental Protection Agency ("EPA") has included both sites on the National Priority List of hazardous sites in need of immediate cleanup under CERCLA. The hazardous nature of these sites and the possibility of severe groundwater contamination has also made them priority targets of cleanup efforts by the DEP under the Spill Act.

On August 4, 1983, Industrial Trucking notified the DEP of possibly hazardous discharges at the Woodland dump sites.[2] Following such notification, plaintiffs and the DEP entered into extensive negotiations as to the scope of a Remedial Investigation/Feasibility Study ("RI/FS"). R & H and 3M sought primary responsibility for preparing the study, with the DEP to exercise an oversight role. Burke Affidavit at ¶¶ 4–6. The parties allegedly arrived at a tentative agreement consistent with the companies' desire to manage the RI/FS. Complaint at 3. On February 16, 1984, the DEP informed them that a change in agency policy would bar them from controlling the selection of a contractor to perform the RI/FS. The DEP announced that it would require allegedly responsible parties to deposit into a trust fund the full cost of the DEP's proposed RI/FS for the Woodland sites, plus a twenty percent contingency fee. The two companies refused to comply with the DEP's request. In April, 1984, R & H and 3M reiterated their offer to perform the RI/FS. Both firms pledged that the DEP and the companies involved would have equal representation on the oversight committee.

On June 29, 1984, the DEP issued Administrative Order No. 69 ("AO69"), an agency policy directive which stated that the DEP would henceforth maintain oversight control for all RI/FS work. By issuing AO69, the DEP hoped to insure the continued trust of the public as to the impartiality of the RI/FS process. Complaint, Exhibit C.

R & H, 3M and the DEP continued negotiations concerning a possible compromise method of conducting the RI/FS throughout the remainder of 1984. In January of 1985, the companies reiterated their proposal for equal representation on the oversight

---

action, if any, the United States Congress might take in the future to address the problem. The Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA") had not yet been enacted. *See* Public Hearing before the Senate Committee on Energy and Environment, and Assembly Committee on Agriculture and Envi-

ronment on S–1409 and A–1903 (Spill Compensation and Control Act) June 2, 1976.

**2.** R & H and 3M assert that they informed the DEP as to the possibility of contamination at the Woodland sites as early as April of 1979. Letter from William Hyatt, Jr. to Mr. Rogalski, March 12, 1985 ("Hyatt Letter"), at 5, Plaintiffs' Complaint, Exhibit D.

committee. The DEP again rejected this proposal.

On March 5, 1985, the DEP issued the two Directives which raise questions constituting the crux of this case. Complaint, Exhibits A, B. The Directives charge R & H, 3M and others with hiring Industrial Trucking to "dispose of vast quantities of hazardous waste, including hazardous substances." Directives ¶ 7. They also charge the companies with failure to notify the DEP of the discharges, in violation of N.J.S.A. 58:10–23.11e. *Id.* ¶ 18. The Directives required each firm to pay DEP a total of $880,000 within seven days of receipt of the Directives, in order to fund the costs of a RI/FS for both Woodland sites. The DEP also reserved the right to seek additional compensation and other relief. *Id.* ¶ 19. In the event that the allegedly responsible parties failed to make payment as directed, the DEP threatened to conduct the RI/FS itself, using monies from the New Jersey Spill Fund. The Directives state that the DEP would then sue the companies to recover all costs incurred in conducting the RI/FS. Failure to comply with the Directives would result in liability equal to three times the cost of conducting the RI/FS, N.J.S.A. 58:10–23.11f(a), and a first priority lien on all the plaintiffs' property, N.J.S.A. 58:10–12.11f(f). *Id.* at 4–5.

On March 12, 1985, R & H and 3M notified DEP that they would refuse to comply with the Directives. The following day, Purex sent a letter to the DEP denying all liability for the wastes at the Woodland sites. On March 27, 1985, DEP entered into a Consent Order with Hercules, Inc. ("Hercules"), another recipient of the Directives, concerning the Woodland sites. Hercules agreed to provide $275,000 to-ward the costs of an RI/FS. At some time since then, a three-member committee composed of two DEP representatives and one Hercules representative selected a contractor to perform the RI/FS at a cost of approximately $1.76 million.

On April 10, 1985, the DEP denied a request for an administrative hearing by R & H and 3M, as the Spill Act does not require pre-enforcement review. *See In re Witco Chemical Co.*, Docket No. A–1161–81T2, slip op. (N.J.Super.Ct.App.Div. October 11, 1983). The DEP also informed the two companies that no Spill Fund monies would be used in financing the RI/FS, in order to avoid any possible preemption problem under CERCLA.[3] Instead, the DEP stated that it would be using funds derived from the Governor's Contingency Fund, and monies supplied through a Consent Order with Hercules, to initiate the RI/FS. The DEP threatened to seek sanctions against all responsible parties, but repeated its offer for them to join the RI/FS under the auspices of the DEP.

On May 15, 1985, R & H and 3M filed a motion for temporary restraints against enforcement of the DEP Directives. The court granted the request and issued an order prohibiting the DEP from imposing its threatened sanctions until the court reached a decision on the merits of plaintiffs' application for injunctive and declaratory relief. On May 20, 1985, Purex moved to intervene in the action brought by plaintiffs.

## PUREX'S MOTION TO INTERVENE

Purex moves for leave to intervene as a plaintiff as of right, in accordance with Fed.R.Civ.P. 24(a). In the alternative, Purex asks the court to grant permissive in-

---

**3.** In February, 1984, the DEP applied to the EPA for Superfund monies to conduct a RI/FS of the Woodland sites. In November, 1984, the DEP withdrew its request for such funds. The DEP did so in order to prevent implementation of EPA's policy of permitting private parties to control the RI/FS process. Burke Affidavit at 6–7; Complaint at 10–11. The EPA adopted this approach in order to alleviate the severe shortage of funds available for conducting RI/FS work.

The court notes that the issue of federal preemption of the Spill Act is raised in an action currently pending before the United States Supreme Court on a writ of certiorari from the New Jersey Supreme Court. *Exxon Corp. v. Hunt,* No. 84–978, filed December 17, 1984. The case arises out of an industry challenge to the taxes imposed by the Spill Act. Plaintiffs' complaint does not raise similar issues. Therefore, the Court's ruling will not directly affect the outcome of the instant case.

tervention pursuant to Fed.R.Civ.P. 24(b). For the reasons stated below, this court denies Purex's motion to intervene as of right, but grants its request for permissive intervention.

Fed.R.Civ.P. 24(a)(2) authorizes intervention as of right upon timely application, when the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. *Jet Traders Investment Corp. v. Tekair, Ltd.*, 89 F.R.D. 560, 567 (D.Del.1981).

■ Purex's intervention motion, filed before defendants' responsive pleadings and less than one week after the filing of plaintiffs' original complaint, will cause no delay in these proceedings. *See Donovan v. United States Steelworkers of America*, 721 F.2d 126, 127 (3rd Cir.1983), *cert. denied sub nom.*, *Valenta v. United States Steelworkers of America*, — U.S. —, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984). Purex has the necessary direct and substantial interest in the litigation, as being potentially jointly and severally liable with the other plaintiffs for all the cleanup costs at the Woodland sites. Purex's interest may as a practical matter be impaired as a direct result of this suit. *See Jet Traders Investment Corp. v. Tekair, Ltd., supra,* 89 F.R.D. at 568. If Purex is not permitted to join the suit, it asserts that it will be forced to present identical issues of law and fact to this court in a later action.[4]

Purex may not intervene as of right because it fails to show that its interest would not be adequately represented by plaintiffs in this action. Although Purex's burden of showing this inadequacy of representation is minimal, Purex fails to meet even this lenient standard. *See Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972). Purex contends that it can make arguments that existing plaintiffs have not asserted; however, Purex has failed to present any new arguments in its complaint.[5]

In the interests of fairness and judicial economy, the court will exercise its discretion to grant permissive intervention pursuant to Fed.R.Civ.P. 24(b). Purex's complaint raises issues of law identical to those presented by the plaintiffs. *See New Orleans Public Service, Inc. v. United Gas Pipe Line Co.*, 690 F.2d 1203, 1209–10 (5th Cir.1982) (granting permissive intervention where the parties contest the validity of the same document). Purex's intervention will neither delay nor complicate these proceedings since it asserts claims identical to the plaintiffs' claims. *See Nuesse v. Camp*, 385 F.2d 694, 704 (D.C.Cir.1967). Finally, because plaintiffs consent to the intervention and defendants do not object, no prejudice to the rights of the parties will likely arise through Purex's intervention. Therefore, this court grants leave for Purex to intervene in this action pursuant to Fed.R. Civ.P. 24(b).

## DEFENDANTS' ELEVENTH AMENDMENT DEFENSE

■ Defendants assert that the Eleventh Amendment bars plaintiffs' claims against the DEP. It is well established that a federal civil rights action may not be brought against a state or a department or agency of a state unless the state waives its immunity under the Eleventh Amendment. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Laskaris v. Thornburgh*, 661 F.2d 23, 25–26 (3rd

---

**4.** Purex has already filed a separate action. The parties have consented to extend the deadline for filing answers in anticipation of a ruling on Purex's motion to intervene in this case. Although defendants have questioned the extent of Purex's showing that it has been coerced by DEP's Directives, Purex has since submitted affidavits supporting its claims.

**5.** The court notes that Purex's Complaint in Intervention is virtually identical to plaintiffs' Complaint.

Cir.1981). Such immunity covers claims for damages and for injunctive relief, and applies even where the relief sought is purely prospective. *Id.* The State of New Jersey has neither expressly nor impliedly waived its immunity so as to permit this lawsuit against the DEP. Of course, under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), plaintiffs are free to maintain this action for prospective relief against the two state officials named as defendants. In light of the foregoing, plaintiffs' claims against the DEP will be dismissed.

## DISCUSSION

Defendants have moved for summary judgment. The standard for granting summary judgment is a stringent one. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be granted only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Special Jet Services, Inc. v. Federal Insurance Co.,* 643 F.2d 977 (3rd Cir.1981); *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62 (3rd Cir. 1978). In deciding whether an issue of material fact does exist, the court is obligated to view all doubt in favor of the nonmoving party. *Tomalewski v. State Farm Insurance Co.,* 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.,* 464 F.2d 870, 874 (3rd Cir. 1972).

Both sides agree that there is no genuine issue of material fact outstanding in this litigation. Thus, this matter is ripe for summary judgment. Accordingly, the court will proceed to consider plaintiffs' Rule 56 motion before addressing plaintiffs' request for injunctive and declaratory relief.

Plaintiffs assert that the enforcement scheme set forth in the Spill Act unlawfully coerces them into compliance with the DEP's Directives. In particular, plaintiffs maintain that the Act is unconstitutional because it neither provides for pre-enforcement review of the Directives, nor allows

for the assertion of "good faith" defenses to the imposition of treble damages for failure to comply therewith. Furthermore, plaintiffs allege that if they do comply, they are unable to challenge the Directives in an action for reimbursement of their expenditures pursuant to the Directives, even if they are later found blameless for the discharges at the Woodland sites. An analysis of these claims requires the court to examine the Spill Act's enforcement scheme.

### A. The Spill Act Enforcement Scheme

#### 1. Strict Liability

Under Section 8(c) of the Spill Act, "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing ... shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs." N.J.S.A. 58:10–23.11g(c). Cleanup and removal expenses are broadly defined, so as to include the costs of preparing an RI/FS. N.J.S.A. 58:10–23.11b(d).

The strict liability standard incorporated in the Spill Act is plainly consistent with due process. State statutes which impose liability without fault for damages to state and private interests due to oil and chemical discharges constitute valid regulatory measures pursuant to a state's police power. *Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 620–21 (4th Cir.1979) (Imposition of strict liability for state's oil cleanup costs under Virginia statute, 1973 Va.Acts, ch. 417); *Portland Pipe Line Corp. v. Environmental Improvement Commission,* 307 A.2d 1, 44–45 (Me.), *appeal dismissed for want of substantial federal question,* 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326 (1973) (Imposition of strict liability for state's oil cleanup expenses under Maine statute, 38 M.S.R.A. § 552(2)).

#### 2. Treble Damages

In this case, the DEP invoked the Spill Act pursuant to a directive to each of sev-

eral alleged toxic waste dischargers to "arrange for the removal of [its] discharge." N.J.S.A. 58:10–23.11f(a). Failure to comply with such an order subjects parties named therein to the Spill Act's mandatory treble damages provision, N.J.S.A. 58:10–23.-11f(a), in a subsequent action by the state to recover removal costs incurred by the DEP. Although the state may settle on the amount sought in a cost recovery action, N.J.S.A. 58:10–23.11q, a court is required to award treble damages after a finding of (a) responsibility for the alleged discharges, and (b) a knowing refusal to comply with a DEP directive, N.J.S.A. 58:10–23.11f(a).

No disagreement exists between the parties as to the constitutionality of the Spill Act's treble damages provision, standing alone. Treble damages provisions, such as N.J.S.A. 58:10–23.11f(a), are common statutory enforcement mechanisms which comport with due process. *See, e.g., American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (Sherman Antitrust Act).

### 3. Penalties

In its directives concerning the Woodland sites, the DEP threatened plaintiffs with both treble damages and daily penalties for failure to comply with the agency demand for funds. Plaintiffs' Complaint, Exhibits A and B at 4–5. Nevertheless, defendants now concede that daily penalties, pursuant to N.J.S.A. 58:10–23.11u(a), may not as a matter of law be assessed for failure to comply with the directives. Penalties are issued for violations of Directives promulgated under the Spill Act.[6] Defendants' Brief at 7, 9–11. Therefore, this action

presents no real issue with regard to the penalty provisions of the Spill Act.

### 4. Defenses

In a Spill Act cost recovery action brought by the State, a defendant may contest its responsibility for alleged discharges. An actual discharger, however, possesses only a few severely limited defenses to liability. "An act or omission caused solely by war, sabotage, or God, or a combination thereof, shall be the only defenses which may be raised by any ... [party] responsible for a discharge in any action arising under the provisions of this act." N.J.S.A. 58:10–23.11g(d).[7]

In order to collect treble damages from plaintiffs for noncompliance with a DEP Directive, the DEP must prove that plaintiffs were responsible for an unlawful discharge, N.J.S.A. 58:10–23.11g; N.J.S.A. 58:10–23.11f(a), and that they failed to comply with a directive issued pursuant to N.J.S.A. 58:10–23.11f(a). The imposition of treble damages is mandatory in such circumstances. *Id.* Accordingly, "good faith" defenses are of no avail to the imposition of mandatory treble damages.

By contrast, CERCLA provides that treble damages may be imposed on an alleged responsible party, in a cost recovery action for failure to comply with a cleanup order, if the defendant refused to comply "without sufficient cause." At least some courts have ruled that this language provides alleged dischargers with a good faith defense to the imposition of treble damages. *Wagner Electric Corp. v. Thomas*, 612 F.Supp. 736 (D.Kan.1985); *United States v. Reilly Tar & Chemical Corp.*, 606 F.Supp. 412, 419–21 (D.Minn.1985). *But cf. Aminoil, Inc. v. United States*

---

**6.** Accordingly, defendants maintain that the plaintiffs are independently liable for daily penalties due to their failure to give the DEP timely notice of their discharges, N.J.S.A. 58:10–23.11e, regardless of their liability for failure to comply with the Directives concerning a RI/FS.

**7.** Some disagreement arises in the New Jersey Courts as to whether a "third party defense" also exists under the Spill Act. *Compare DEP v. Exxon Corp.*, 151 N.J.Super. 464, 376 A.2d 1339

(Ch.Div.1977) (Third party defense allowed to company which could show that original discharge occurred before it took possession of the property), *with Lansco, Inc. v. DEP*, 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), *aff'd*, 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), *certif. denied*, 73 N.J. 57, 372 A.2d 322 (1977) (Acts of third parties or vandals are not included as exceptions to liability for discharge or spillage of petroleum products).

*E.P.A.,* 599 F.Supp. 69, 73–74 (C.D.Cal. 1984).

■ The mandatory nature of treble damages under the Spill Act does not alone cause the statute to violate due process. Mandatory treble damages is a common enforcement mechanism. *See, e.g., Cantor v. Detroit Edison Co.,* 428 U.S. 579, 599, n. 39, 96 S.Ct. 3110, 3121, n. 39, 49 L.Ed.2d 1141 (1976) (Sherman Antitrust Act).

### 5. Lack of Pre-Enforcement Review

■ The Spill Act does not permit judicial review of DEP cleanup directives prior to enforcement of such orders or the initiation of a cost recovery action by DEP. Ordinarily, due process requires some kind of a hearing prior to deprivation of a significant property interest. *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). Nevertheless, "due process is flexible and calls for such procedural protections as the situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Accordingly, summary adjudications are justified in appropriate circumstances involving emergency situations or serious danger to public safety. *Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S. 264, 299–300, 101 S.Ct 2352, 2372–73, 69 L.Ed.2d 1 (1981). For instance, postponement of notice and a hearing has been found to be consistent with due process when necessary to protect the public from the drug trade, *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), bank failures, *Coffin Bros. & Co. v. Bennet,* 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928), or the delinquent submission of tax returns, *Phillips v. Commissioner,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). Several recent decisions in this district have sustained provisions of CERCLA which deny judicial review of EPA cleanup orders prior to the initiation of a cost recovery action. *See, e.g., Wheaton v. EPA,* Civ. No. 84–4330, slip op. (D.N.J. July 11, 1985); *Lone Pine Steering Committee v. EPA,* 600 F.Supp. 1487 (D.N.J.1985); *Earthline*

*Co. v. Kin-Buc, In.,* Civ. No. 83–4226, slip op. (D.N.J. July 23, 1984). *But cf. Industrial Park Development Corp. v. EPA,* 604 F.Supp. 1136 (E.D.Pa.1985) (Criticizing lack of pre-enforcement review of various administrative orders under CERCLA). Pre-enforcement review of certain administrative orders is also unavailable under other federal environmental statutes. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Administration, supra.*

Plaintiffs do not object to the Spill Act's denial of pre-enforcement review of DEP directives per se. Rather, plaintiffs contend that the combined effect of the absence of pre-enforcement review, the lack of an alternative means of contesting alleged responsibility for discharges and the threat of treble damages for noncompliance with DEP orders constitutes unconstitutional coercion. The court will now proceed to examine defendants' claim that plaintiffs have an alternative remedy available which allows them to avoid the risk of treble damages.

### 6. The Spill Fund

The Spill Act provides for the establishment of the New Jersey Spill Compensation Fund ("Spill Fund"). Among other things, the Spill Fund is intended to reimburse parties injured by unlawful discharges. N.J.S.A. 58:10–23.11i. The Spill Fund is financed by a tax on the shipment of petroleum and chemical products within the state. N.J.S.A. 58:10–23.11h. Claims must be filed by an injured party "not later than one year after the date of discovery of damage." N.J.S.A. 58:10–23.11k.

Spill Fund claimants are encouraged to seek reimbursement from the party responsible for the discharge, N.J.S.A. 58:10–23.-11 *l;* however, if such efforts prove unsuccessful, parties may apply to the Spill Fund for compensation. The Administrator of the Spill Fund is authorized to settle all claims against the Spill Fund, N.J.S.A. 58:10–23.11m, and to convene boards of arbitration to resolve disputes over reimbursement. N.J.S.A. 58:10–23–11n. Decisions of the Board are final, and judicial

review of such decisions is available before the Appellate Division of the Superior Court. N.J.S.A. 58:10–23.11n(g).

Defendants contend that under the Spill Act, plaintiffs can avoid treble damages for cleanup costs by (a) complying with the Directives, and (b) filing a claim against the Spill Fund pursuant to N.J.S.A. 58:10–23.11g(a) and 58:10–23.11k, and then (c) contesting liability before an arbitration board. If necessary, plaintiffs may seek judicial review of an adverse result. Defendants' Brief at 21–22.

Plaintiffs respond that defendants "ignore the reality that under the facts in this case plaintiffs are precluded from bringing a claim against the Spill Fund for reimbursement." Plaintiffs' Reply Brief at 4. According to plaintiffs, several aspects of the Spill Fund scheme render it useless to them as a means to challenge the DEP's Directives.

First, plaintiffs originally asserted that they were barred from receiving any compensation from the Spill Fund because the RI/FS could be funded by the EPA using Superfund monies, pursuant to CERCLA § 221(c)(1), 42 U.S.C. § 9631(c)(1). Spill Fund monies cannot be utilized to pay for remedial costs at a discharge site unless the Spill Fund Administrator has determined "that adequate funds from another source are not or will not be available." N.J.S.A. 58:10–23.11f(d). As the Woodland sites are included on the National Priority List, CERCLA provides for Superfund monies for remedial actions at these sites. Such funds are no longer available because the DEP withdrew its Superfund request, in order to insure its continued control over the RI/FS process. Furthermore, if plaintiffs comply with the DEP Directives pursuant to the Spill Act, they have no claim for reimbursement under CERCLA. Consequently, CERCLA does not constitute a barrier to plaintiffs' recovery of Spill Fund monies.

The DEP's decision to fund the RI/FS at the Woodland sites with funds provided through the Governor's Contingency Fund also does not bar plaintiffs' recovery from the Spill Fund. The Spill Act simply states that "the fund shall be strictly liable, without regard to fault, for all cleanup and removal costs...." N.J.S.A. 58:10–23.11g(a). If plaintiffs comply with the Directives, they will pay a substantial amount into the Spill Fund; if they are subsequently found free of responsibility for any discharges, they are entitled to reimbursement of the contributions to the fund.

Second, plaintiffs contend that the Spill Act bars recovery of Spill Fund monies requested over six years from the date of the incident which caused the damage. This provision was repealed by the legislature effective September 6, 1984. L.1984, c. 142, § 3. As the DEP invoked the Spill Act in its directives to plaintiffs on March 5, 1985, the court finds this provision inapplicable to this case, despite plaintiffs' arguments to the contrary.

Third, plaintiffs argue that they are statutorily barred from asserting a claim against the Spill Fund by the one year statute of limitations. N.J.S.A. 58:10–23.11k. The DEP officially issued its Directives informing the plaintiffs of their potential liability on March 5, 1985. Nearly two years earlier, the DEP had unofficially informed plaintiffs of their alleged discharges at the Woodland sites. The question arises as to the proper starting point for application of the one year statute of limitations. If the correct date is the date the DEP unofficially informed plaintiffs of the possibility of contamination at the Woodland sites, then the statute of limitations has long since expired. The court does not approve of this method. Rather, the court finds that the correct date for the starting of the one year statute of limitations should be set at the date when plaintiffs were officially notified that the DEP would seek monies from them to fund the RI/FS. Defendants apparently agree with this interpretation, as they contend that plaintiffs are not barred from applying to the Spill Fund by the statute of limitations contained in N.J.S.A. 58:10–23.11k. Furthermore, defendants note that,

the administrative directives provided for in N.J.S.A. 58:10–23.11f(a) functions to provide a potentially responsible party with notice of its possible liability and the opportunity to mitigate damages. In the context of the Spill Act, this notice is important because generators of hazardous waste can be responsible parties and may have no knowledge of the discharge of hazardous substances that they have generated but no longer control.

Defendants' Brief at 18.

Although the plaintiffs in this case surely had constructive notice of their potential liability prior to March, 1985, they were not officially assured that any claim would be filed against them until the issuance of the Directives. Accordingly, the court finds that the one year statute of limitations should not begin to run until the issuance of the Directives, on March 5, 1985. This means that as of this date, plaintiffs are not statutorily barred from seeking indemnity from the Spill Fund for their expenses incurred in complying with the Directives by N.J.S.A. 58:10–23.11k.[8]

Finally, plaintiffs may not recover their expenditures if they are actually responsible for the discharges. N.J.S.A. 58:10–23.11g(c). *See DEP v. Ventron Corp.*, 182 N.J.Super. 210, 228, 440 A.2d 455 (App.Div. 1981), *modified on other grounds*, 94 N.J. 473, 468 A.2d 150 (1983). Plaintiffs assert that because the DEP considers them to be responsible parties, they lack standing to make a claim against the Spill Fund. There is no merit to this argument. As plaintiffs deny responsibility for the wastes at the Woodland sites, they are free to apply for such indemnification from the Spill Fund. Plaintiffs will only be denied compensation if the DEP can substantiate

its position that plaintiffs are responsible parties.

The Spill Fund provisions of the Spill Act provide an alternative remedy for parties wishing to challenge the validity of DEP directives. Accordingly, plaintiffs are not forced to seek vindication of their alleged lack of responsibility for hazardous discharges only in a subsequent cost recovery action.

**B. Constitutionality of the Statutory Scheme**

The foregoing discussion has shown that none of the individual components of the Spill Act enforcement framework violates plaintiffs' due process rights. The question remains as to whether the elements together constitute an impermissibly coercive scheme, or whether, as defendants claim, the Act creates a lawful incentive structure, reasonably necessary to induce compliance with DEP Directives related to hazardous waste cleanup efforts.

Plaintiffs assert that the Spill Act effectively denies them an opportunity to seek judicial review of DEP's Directives concerning the Woodland sites. It is axiomatic that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1975); *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Furthermore, the essential feature of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). *See Gannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914).

**8.** Theoretically, a problem could arise in the future if plaintiffs are unable to discern the full extent of their claim against the Spill Fund before the statute of limitations expires on March 5, 1986. Such an outcome is possible due to the extended duration of the RI/FS process. Nevertheless, if plaintiffs prevail in a claim against the Spill Fund, based on a finding that they are not responsible parties, they should be able to avoid any later assessments against them, unless the government presents new evidence of their responsibility. In that event, plaintiffs should once again have one year in which to file another claim against the Fund. The Fund Administrator possesses wide latitude in setting the procedures for the filing of such claims. N.J.S.A. 58:10–23.11k. The administrator should adopt procedures as set forth by the court pursuant to such authority.

■ Plaintiffs rely on a line of cases, derived from *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which stand for the proposition that anyone subject to an administrative order has "a due process right to contest the validity of [the] order ... without necessarily having to face ruinous penalties if the suit is lost." *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1119 (2nd Cir. 1975). Under *Ex Parte Young, supra,* a law may not impose such severe conditions on the right to judicial review that a party wishing to challenge the validity of administrative action will be intimidated into abandoning its rights; "such a result is the same as if the law [expressly] prohibited the [party] from seeking judicial construction of laws which deeply affect its rights." 209 U.S. at 147, 28 S.Ct. at 448. *Accord Oklahoma Operating Company v. Love,* 252 U.S. 331, 336, 40 S.Ct. 338, 340, 64 L.Ed. 596 (1920); *Wadley Southern Railway Co. v. Georgia,* 235 U.S. 651, 661, 35 S.Ct. 214, 217, 59 L.Ed. 405 (1915) ("[The] right [to judicial review] is merely nominal and illusory if the party affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to the protection of the law.").

According to plaintiffs, they are permitted to challenge DEP's Directives only at the risk of each incurring treble damages for the full cost of a RI/FS at the Woodland sites, an amount roughly equal to $5.3 million. Plaintiffs maintain that such penalties are so great as to "deter even the boldest and most confident" prospective litigant. Plaintiffs' Brief at 22–23, *quoting Oklahoma Operating Co. v. Love, supra,* 252 U.S. at 336, 40 S.Ct. at 340. In support of their allegations of coercion, plaintiffs submit affidavits from their corporate officers which indicate that the threat of treble damages will "coerce" them into compliance with DEP's Directives unless the court grants the relief requested.[9]

■ Mandatory sanctions which are unlawfully coercive cease to infringe due process rights if it is possible to assert good faith defenses to their application. In other words, the requirement of due process is satisfied when a statute provides that a party refusing to submit to an administrative order may avoid penalties for noncompliance by demonstrating reasonable grounds for such disobedience in a subsequent agency enforcement action. *Reisman v. Caplin,* 375 U.S. 440, 447, 84 S.Ct. 508, 512, 11 L.Ed.2d 459 (1964); *Oklahoma Operating Co. v. Love, supra,* 252 U.S. at 336–38, 40 S.Ct. at 340–41.

Plaintiffs contend that the mandatory nature of the Spill Act's treble damages provision, N.J.S.A. 58:10–23.11f(a), renders it unconstitutional in light of the unavailability of a right to challenge DEP cleanup Directives prior to an agency cost recovery action. To prove their point, plaintiffs refer the court to several recent decisions concerning Section 107(c)(3) of CERCLA, which provides treble damages for failure to comply, "without sufficient cause," with various EPA orders including a cleanup order under Section 106 of CERCLA. 42 U.S.C. §§ 9607(c)(3), 9606. CERCLA does not permit judicial review of a cleanup order under Section 106(a) prior to a cost recovery action by EPA to remedy a party's noncompliance. The availability of a good faith defense to imposition of treble damages for such refusal has been held to sustain the application of Section 107(c)(3) to a cleanup order under Section 106(a) of CERCLA. *United States v. Reilly Tar & Chemical Corp.,* 606 F.Supp. 412, 419–22 (D.Minn.1985) (Construing "without sufficient cause" to permit a good faith defense

9. Plaintiffs fail to explain the fact that Sohio, another recipient of DEP's Directives regarding the Woodland sites, has yet to seek relief from DEP's Directives. Plainly, the company has not been coerced into compliance with these orders. Furthermore, Purex has neglected to present a persuasive showing that it will be intimidated into abandonment of its right to resist compliance if the court denies the motions for injunctive relief. The court notes that Purex had taken no action to challenge DEP's Directives until the Woodland Study Group filed this lawsuit. Nevertheless, plaintiffs create at least an issue of fact as to the presence of coercion sufficient to defeat defendants' motion for summary judgment on this issue.

to imposition of treble damages; also upholding the constitutionality of Minn.Stat. § 115B.18(1) (1985), a similar penalty provision in "MERLA," a Minnesota toxic waste control statute, because of the availability of good faith defenses); *Wagner Electric Corp. v. Thomas,* 612 F.Supp. 736 (D.Kan. 1985) (following *United States v. Reilly Tar & Chemical Corp., supra*). Another federal trial court has enjoined imposition of treble damages or daily penalties for noncompliance with a CERCLA cleanup order based on a finding that the statute provides neither pre-enforcement review of, nor assertion of good faith defenses to, such sanctions. *Aminoil, Inc. v. United States Environmental Protection Agency,* 599 F.Supp. 69, 72–73 (C.D.Cal.1984) (reaching more restrictive interpretation of "without sufficient cause" language in Section 107(c)(3) of CERCLA).

This case is fundamentally different from the situation posed in *Ex Parte Young, supra,* and *Aminoil, Inc. v. USEPA, supra,* because of the opportunity, under the Spill Act, to seek reimbursement from the Spill Fund for monies paid to DEP in accordance with Directives issued pursuant to N.J.S.A. 58:10–23.11f(a). The doctrine of *Ex Parte Young* and *Oklahoma Operating Co. v. Love, supra,* is based on the absence of any means to challenge administrative action free of the threat of punitive damages. In *Wadley Southern Railway Co. v. Georgia, supra,* the Court upheld penalty provisions in a state railroad rate regulation statute, similar to those in *Ex Parte Young* and *Oklahoma Operating Co. v. Love,* precisely because Georgia law also allowed those affected by rate orders to bring "proceedings ... against the [State railroad] commission to test the validity of its orders." 235 U.S. at 668–69, 35 S.Ct. at 220–21. In *Ex Parte Young* and *Oklahoma Operating Co. v. Love,* however, the only available recourse for the affected railroad companies to challenge rate orders they considered confiscatory was in contempt proceedings brought by the State to enforce compliance with rate orders of the State railroad commission. 209 U.S. at 145–46, 28 S.Ct. at 447–

48; 252 U.S. at 334–35, 40 S.Ct. at 339. Similarly, the analysis of the availability of good faith defenses in *Aminoil, Inc. v. USEPA, supra, United States v. Reilly Tar & Chemical Corp., supra,* and *Wagner Electric v. Thomas, supra,* is premised on the fact that CERCLA provides no means to challenge EPA cleanup orders prior to commencement of a cost recovery action. 599 F.Supp. at 75; 606 F.Supp. at 416; 612 F.Supp. at 747. In *Wagner Electric v. Thomas, supra,* the court noted that the doctrine of *Ex Parte Young* condemns penalties which effectively "close up *all* approaches to the courts." At 747, *citing* 209 U.S. at 147–48, 28 S.Ct. at 448–49 (emphasis added). The court in *Aminoil, Inc., supra,* took particular notice of the fact that under CERCLA "no clear right exists for these alleged responsible parties to comply with the administrative order and then challenge its validity and seek reimbursement from the government." 599 F.Supp. at 75. The Spill Act, on the other hand, appears to provide just such a remedy.

In *Wadley Southern Railway Co. v. Georgia, supra,* the Court set forth a rule which provides the focus for this court's inquiry:

> there is no room to doubt the power of the state to impose a punishment heavy enough to secure obedience to [administrative] orders after they have been found to be lawful; *nor to impose a penalty for acts of disobedience, committed after the [party subject to the order] had ample opportunity to test the validity of [such] orders and failed to do so.*

235 U.S. at 667, 35 S.Ct. at 220. The Court stated further that threatened imposition of penalties for noncompliance with an administrative order do not violate due process,

> where, ... after reasonable notice of the making of the order, the [party subject to the order] failed to resort to the safe, adequate, and available remedy by which it could test in the courts its validity, and preferred to make its defense by attack-

ing the validity of the order when sued for the penalty when that defense, ... proved to be unsuccessful.

235 U.S. at 668–69, 35 S.Ct. at 220–21. *Accord St. Regis Paper Co. v. United States,* 368 U.S. 208, 226–27, 82 S.Ct. 289, 299–300, 7 L.Ed.2d 240 (1961); *St. Louis, Iron Mountain & Southern Railway Co. v. Williams,* 251 U.S. 63, 65, 40 S.Ct. 71, 72, 64 L.Ed. 139 (1919). In the case at bar, the court is faced with the question of the adequacy of a claim against the Spill Fund as a means of contesting DEP's directives. Unless this remedy is found to be lacking, it is unnecessary to address the implications of the Spill Act's denial of good faith defenses to the imposition of treble damages for noncompliance with DEP Directives.

While the holding in *Wadley Southern Railway Co. v. Georgia* requires an alternative path of access to the courts free of the threat of coercive penalties, such a path need not necessarily consist of a cause of action to challenge agency orders in court, as in *Wadley.* "A mode of testing the validity of a regulation by an independent administrative proceeding" is sufficient, so long as the affected party may ultimately have recourse to judicial review. *Yakus v. United States,* 321 U.S. 414, 433–34, 438, 445, 64 S.Ct. 660, 671–72, 673, 677, 88 L.Ed. 834 (1944); *Bradley v. City of Richmond,* 227 U.S. 477, 33 S.Ct. 318, 57 L.Ed. 603 (1913). *Accord Ford Motor Company v. Coleman,* 402 F.Supp. 475, 485, n. 24 (D.D. C.1975). In *Yakus v. United States, supra,* the Court stated that

there is no constitutional requirement that [the testing of the validity of an administrative order] be made in one tribunal rather than another, so long as there is an opportunity to be heard and for judicial review which satisfies the demands of due process ... this was recognized in *Bradley v. Richmond, supra,* and in *Wadley Southern Railway Co. v. Georgia, supra,* [235 U.S. at] 667, 669 [35 S.Ct. at 220], and has never been doubted by this court.

321 U.S. at 444, 64 S.Ct. at 677. *See also* the Clean Air Act, 42 U.S.C. § 7401 *et seq.* and the Surface Mining Control & Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* both of which provide for administrative review of orders for which penalties are available for noncomplying parties. *See also Aminoil, Inc. v. USEPA, supra,* 599 F.Supp. at 75, n. 2.

The issue of whether the Spill Fund reimbursement procedures are constitutionally sufficient to satisfy due process requires the court to analyze and weigh the various interests affected. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In determining the adequacy of administrative procedures, the court must consider (1) the private interest at stake, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) the "Government's interest, including ... the fiscal and administrative burdens that ... additional or substitute procedural requirement[s] would entail." *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

The parties have not given much attention in their papers to the question of the adequacy of the Spill Fund reimbursement procedures. Nevertheless, the Spill Fund sets forth a scheme which is rather detailed and easily amenable to the Court's analysis. Furthermore, the plaintiffs have given a clear indication, in their submissions, of their belief that the Spill Act should provide a trial-like administrative hearing as to liability prior to deprivation of the property of alleged dischargers for purposes of preparing a RI/FS. Plaintiffs' Brief at 19 ("full hearing on the merits"); Plaintiffs' Reply Brief at 7 ("plenary proceedings to contest allegations underlying the treble damages claims").

Before addressing the procedures for making claims against the Spill Fund, the court will address two lingering questions

as to the availability of the Spill Fund remedy to plaintiffs. First, the court notes that the Spill Fund is of finite size and subject to competing demands. Parties considering whether to comply with a DEP Directive to fund a RI/FS might be concerned that disbursements from the Fund might so deplete the Fund as to prevent reimbursement in full. Such a result, after an allegedly responsible party demonstrates its innocence in Spill Fund claim proceedings, would clearly render the Spill Fund remedy illusory and violative of due process. The Spill Act provides for this contingency, however. Under N.J.S.A. 58:10–23.11r, any party receiving an award from the Fund which exceeds the current balance therein is entitled to full compensation as soon as revenues to the Fund permit the same.

Second, there is the question of the one year statute of limitations for claims against the Spill Fund. The court concluded above that N.J.S.A. 58:10–23.11k permits claims seeking recovery of monies paid in compliance with DEP cleanup directives to be filed within one year of the issuance of the directive. At this stage, the court notes that its interpretation is consistent with the principle that

[i]f a construction of the statute is fairly possible by which a serious doubt of constitutionality may be avoided, a court should adopt that construction.

*Califano v. Yamasaki,* 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979). Furthermore, the court is inclined to assume that the State legislature intended to adopt fair procedures, absent statutory language to the contrary. *Id. See also Wagner Electric v. Thomas, supra,* at 746; *United States v. Reilly Tar & Chemical Corp., supra,* 606 F.Supp. at 419, n. 3 (applying this rule to equate "sufficient cause" with "good faith").

The procedures by which private parties may make claims on the Spill Fund are set forth at N.J.S.A. 58:10–23.11k, *l,* m and n. The Spill Act provides for three stages of review of claims against the Spill Fund. First, for a period after all affected parties are notified of a claim, the chief executive of the Spill Fund, the "administrator," is encourged to settle claims. N.J.S.A. 58:10–23.11(*l*), m. Second, claims are to be considered by "boards of arbitration" consisting of one or three persons. N.J.S.A. 58:10–23.11n. Finally, a claimant may seek judicial review of the decision of an arbitration board. N.J.S.A. 58:10–23.11n(g). A board of arbitration is convened under the Spill Act when an interested party challenges the "validity or amount" of a claim against the Fund. N.J.S.A. 58:10–23.-11n(a). In a case such as this, arbitration proceedings would presumably be initiated by the DEP's objections to a claim for reimbursement by plaintiffs.

The arbitration procedure set forth in the Spill Act adheres to a series of deadlines. The administrator of the Spill Fund is required to notify "all affected parties" of a claim "as soon as practicable." N.J.S.A. 58:10–23.11k. Section 15 of the Act, N.J.S.A. 58:10–23.11n, provides that arbitrators must be designated within thirty calendar days after notice of a claim. Section 15(b)(1). If arbitrators are not designated by the parties, the American Arbitration Association ("AAA") is called in to provide substitutes. Section 15(b), (b)(2). An arbitration board is obliged to render a decision "within 60 calendar days of the final appointment of the board unless the parties otherwise agree in writing to an extension." Section 15(f). "Any action for judicial review [of an arbitration decision] shall be filed ... within 30 days of the filing of the decision with the administrator." Section 15(g). Any award made by an arbitration board is to be certified to the administrator between 30 and 60 days after the board's decision. Section 15(h).

Section 15 of the Spill Act establishes a broad right of participation in arbitration proceedings. "If the source of discharge is not known, *any person* may contest ... claims to the fund." Section 15(a) (emphasis added). Furthermore, in general, the Act permits "persons alleged to have caused the discharge, the administrator or

*other persons* [to] contest" claims to the fund. *Id.* (emphasis added).

Although the Spill Act assures all parties a right to counsel, Section 15(d), it does not specify the rights of parties to present proof. In this regard, it seems reasonable to assume that the State legislature intended the Spill Fund arbitrators to follow generally accepted arbitration practices, such as those prescribed by the AAA. Under such standards, arbitrators have broad leeway to consider relevant evidence and are encouraged to accept any relevant evidence the parties wish to provide without causing undue delay of the proceedings.

With respect to the powers of arbitrators, the Spill Act declares that arbitration boards "shall have the power to order testimony under oath," Section 15(d), and may issue subpoenaes in order to compel attendance and testimony of witnesses and the production of documents. *Id.* Boards of arbitration are required to submit written decisions to all parties. Section 15(f).

There can be no doubt that the Spill Act guarantees to claimants against the Spill Fund notice, an opportunity to be heard and a right to subsequent judicial review of any decision reached by a Spill Fund arbitration board. In particular, N.J.S.A. 58:10–23.11n provides plaintiffs a forum in which to litigate the issue of their responsibility for toxic discharges. This procedure is at least sufficient to satisfy the minimal demands of due process.

■ In the first place, there is nothing wrong with the decision of the New Jersey legislature to select arbitration as the proper means for resolving Spill Fund claims, including those by parties wishing to challenge assessments contained in DEP clean-up directives. Delegation of adjudicatory authority by establishment of a system of arbitration is constitutionally permissible "so long as fair procedures are provided and ultimate judicial review is available." *Republic Industries v. Teamsters Joint Council,* 718 F.2d 628, 640 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).[10] Above all, due process requires that a system of arbitration be neutral and objective. *Republic Industries v. Teamsters Joint Council, supra,* 718 F.2d at 640.

The Spill Act arbitration procedure affords more than ample guarantees that arbitration boards will be impartial. Although the statute gives the Spill Fund administrator authority to coordinate the arbitration process, it prevents the administrator from controlling the outcome of such proceedings. The administrator is empowered to decide whether to employ a one-person or a three-person arbitration board. N.J.S.A. 58:10–23.11n(h). Two of the members of a three-person board are selected by private parties; none are chosen by the administrator.[11] *Id.* While the administrator may select a single arbitrator, the statute requires that individual to be "neutral." *Id.* Furthermore, the Spill Act permits the administrator to leave selection of a single arbitrator to the AAA. *Id.* Such a procedure would be appropriate in a case such as this, in which the DEP is essentially a defendant in an action brought by a private claimant; however, the Spill Act does not require such a choice. The mere possibility that the Fund Administrator may select a non-neutral arbitrator does not render the arbitration procedure invalid. A due process claim may be raised in a subsequent proceeding if DEP fails to assure the im-

---

**10.** The legislature may require disputes to be resolved through compulsory arbitration and may delegate such adjudicatory power to private authorities. *See, e.g., Andrews v. Louisville & N.R.R.,* 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972) (Railway Labor Act). The Spill Act does not go this far as its arbitration procedure is not mandatory for private parties wishing to challenge DEP directives. Nor is the mechanism set forth in N.J.S.A. 58:10–23.11n

wholly private, as the Fund administrator supervises the establishment of arbitration boards.

**11.** The statute appears to call for one-person arbitration boards in cases such as this. Three-person boards, meanwhile, are designed to adjudicate cases in which an injured party ("the claimant") files a claim against another party believed to be responsible for toxic discharges ("the person alleged to have caused the discharge"). N.J.S.A. 58:10–23.11n(b).

partiality of a Spill Fund arbitrator. Furthermore, the DEP may obviate this potential defect in the Spill Fund arbitration system by promulgating regulations which contain further guarantees that an impartial arbitrator will be selected.

In all other respects, the Spill Fund arbitration procedure is adequate to satisfy the demands of due process. As the court previously noted, the statute contains no provisions specifying the rights of claimants to present particular kinds of evidence. This factor is cause for concern particularly in instances where a series of "affected parties" join a Spill Fund reimbursement proceeding to contest a claimant's allegations. In such situations however, the parties might obtain an extension of time deadlines in order to address issues of liability in more detail. Furthermore, the Spill Act guarantees parties a right to counsel and grants arbitrators the subpoena power to assure access to "pertinent" evidence. N.J.S.A. 58:10–23.11n(d).

Although the Spill Act does not specify standards to be followed by arbitrators, the statute delineates in sufficient detail the conduct which justifies a finding that a party is "responsible" for discharges of toxic waste. In addition, the statute, by asserting no restrictions on the scope of judicial review, permits the appellate courts of the State of New Jersey broad latitude to correct errors of law and fact by Spill Fund boards of arbitration.

It is unclear that additional procedures prior to judicial review of Spill Fund claims challenging DEP cleanup Directives would serve any interest, private or public. The informal adjudicatory procedure set forth in the Act serves the desire of private parties for a prompt resolution of claims as to whether they are responsible for toxic waste discharges. While additional procedures might provide private parties a greater capacity to present detailed evidence and to present the best possible case against a finding of liability, such procedures would also greatly delay access to the courts and an ultimate resolution of claims to the Spill Fund. Furthermore, the arbitration system has the flexibility to accommodate more extensive proceedings in appropriate circumstances.

The present system of arbitration causes substantially lesser "fiscal and administrative burdens" than those which would be imposed if the Spill Act required the DEP to hold full-fledged administrative hearings on every claim against the Spill Fund. As a result, the DEP is able to concentrate relatively more of its energies and budget on toxic waste control and less on litigation. The New Jersey legislature had strong reasons for adopting such priorities. New Jersey suffers from one of the most serious hazardous waste problems in the nation. About 150 major waste sites exist in the State. This figure includes only those sites possibly eligible for CERCLA superfund monies, and excludes numerous other smaller sites for which remedial action must be paid for by utilizing State and private funding. *See* Committee Meeting of Senate Bill No. 1120, New Jersey Senate Energy and Environment Committee, February 27, 1984 (establishing $10 million Hazardous Discharge Mitigation Fund).

In light of the foregoing, the court concludes that the Spill Fund arbitration system, as a whole, is consistent with due process. Accordingly, the defendants are entitled to summary judgment as to plaintiffs' due process challenge to the Spill Act's treble damages provision, N.J.S.A. 58:10–23.11f(a). Consequently, the court will also deny plaintiffs' motion for declaratory and injunctive relief.

Despite the court's ruling in defendants' favor as to the constitutionality of the Spill Act's treble damages provision, one aspect of DEP's behavior in applying the provision is suspect. The court is troubled by DEP's requirement, in its Directives concerning the Woodland sites, that the allegedly responsible parties act within seven days. There is merit to plaintiffs' argument that such a brief period does not allow allegedly responsible parties sufficient time to reach an informed conclusion as to their probable liability under the Spill Act. Thus, in many circumstances, a seven-day deadline would

coerce an allegedly responsible party into compliance with a Directive for fear of treble damages liability. A party discovering conclusive evidence of nonresponsibility only a short time later would then be required to seek reimbursement from the Spill Fund. While a short compliance deadline does not coerce abandonment of rights of judicial review, it *does* effectively prevent a party with a good faith belief it is not responsible for toxic waste from exercising its right to litigate its liability in a subsequent cost recovery action. In short, the court finds that the seven day deadline smacks of an intent on the part of the State to intimidate private parties into abandoning their right to await a cost recovery action. Accordingly, the court finds that such a severe constraint is contrary to the spirit of *Ex Parte Young, supra. See* 209 U.S. at 147, 28 S.Ct. at 448. Such a procedure serves no legitimate government purpose and is of serious detriment to private parties. Under the test set forth in *Mathews v. Eldridge, supra,* such a short compliance deadline is violative of due process.

In light of this finding, the DEP should adopt longer deadlines for compliance with its orders to contribute to the cost of an RI/FS. Such deadlines must be reasonable under the circumstances, and must allow private parties *some* opportunity to reach an intelligent estimate as to its potential liability. Plainly, the minimum compliance time would be short in emergency situations where rapid government action is required in order to prevent danger to public health and safety. Such is not the case here, where DEP seeks funds to finance an RI/FS after more than a year of negotiations with plaintiffs as to the cost, scope and content of such a remedy.

The DEP's failure to provide plaintiffs with more time to comply with its Directives does not constitute a basis for denial of summary judgment in favor of defendants in this action. The court's temporary restraining order has afforded plaintiffs ample time to determine how best to assert their interests and thus has obviated any detrimental effect on plaintiffs' due process rights.

## CONCLUSION

The Spill Act enforcement scheme provides strong incentives to private parties to participate in the hazardous waste cleanup process and to determine the extent of their liability after such participation has commenced. By exposing private parties subject to DEP cleanup directives to treble damages for noncompliance, the Spill Act does not coerce compliance in violation of the due process rights of alleged dischargers of toxic waste. Such parties have a constitutionally legitimate alternative to the prospect of treble damages: compliance with DEP directives and the filing of a claim for reimbursement against the New Jersey Spill Fund.

Justice Cardozo once described the risks involved when a party determines how to conform its actions to the mandates of the law:

> one who refuses to pay when the law requires that he shall, acts at his peril, in the sense that he must be held to the acceptance of any lawful consequences attached to the refusal.... The price of error may be so heavy as to erect an unfair barrier against the endeavor of an honest litigant to obtain the judgment of the court. In that event, the Constitution intervenes and keeps the courtroom open.... On the other hand, the penalty may be no more than the fair price of the adventure.... In that event, the litigant must pay for his experience, like others who have tried and lost.

*Life & Casualty Ins. Co. of Tennessee v. McCray,* 291 U.S. 566, 574–75, 54 S.Ct. 482, 486, 78 L.Ed. 987 (1934) (citations omitted). Decisions such as *Wadley Southern Railway Co. v. Georgia, supra,* declare that the availability of an alternative means to challenge a deprivation of property by a state agency, free of the threat of penalties, renders those penalties, in the event of a party's refusal to pay, the "fair price of the adventure."

Under the statutory scheme set forth in the New Jersey Spill Act, the State may order private parties to pay for RI/FS

812

projects, prohibit significant private involvement therein, and threaten the same parties with treble damages for failure to comply with such orders. The enforcement mechanism adopted in the Spill Act is severe, but not so strict as to run afoul of the demands of due process. The New Jersey legislature has determined that strong measures are required to address the serious problem of toxic waste; pursuant to authority delegated to the DEP by the legislature, the agency has concluded that strict public controls are necessary in the preparation of RI/FS reports. As the State has implemented such policies in a manner consistent with due process, the court is not free to question its judgment.

In light of the foregoing, defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56, is granted. Accordingly, plaintiffs' motion for declaratory and injunctive relief is denied. The temporary restraints heretofore ordered by the court shall be dissolved. An appropriate order will be entered.